Contracting v. Russo, 412-0547. For the appellant, Ms. Funderburg, and for the appellee, Mr. Palmer and Mr. Metz. You divided your time? Yes. You may. May it please the Court and Counsel, my name is Rochelle Funderburg. I represent the owner of the land and project in this property, Campus Investors, and I also represent Broeren Russo, the general contractor. This case is before you on the grant of motion for summary judgment filed by both A-Hall and by Blager as to their right to enforce subcontractors' liens against the project. Essentially, what this case boils down to is timing and notice, and that really is what the whole intent of the Mechanics' Lien Statute is about, timing and notice. And really what happened here is, if you look at a timeline of events, Broeren Russo submitted Section 5 affidavits to the owner in Chicago title, clearly noted at the top, on December 31st of 2007, February 8th of 2008, April 8th of 2008, May 13th of 2008. Each one of those had at the top a sworn statement by the contractor indicating who had been employed by the general on the project, what had been paid, and what was still due at O-8. Essentially, then, those payments were made, and the next thing that happened, of course, was on August 25th of 2008 when JMC, the subcontractor who appears to have caused most of the problems in this case, submitted a request for payment and an affidavit that said we're only due at O-8 5% retainage on this project. After that, then, the last day on the job for A-Hall and Blager was August the 29th. The next thing that occurred would have been October 28th of 2008, when this waiver of lien to date comes in from JMC indicating that, in fact, it owed A-Hall, Blager, and Gairdow, its subs and suppliers, a good deal more than what was left on the property in the project. After that, then, Campus and Brown-Russo froze whatever money was due in owing to JMC, which happened to be in retainage, 5%. The next step in this whole process is the 90-day notice from A-Hall that came in on November the 18th, the 90-day notice from Blager, which was November the 26th, and then liens from both of them reported on December 15th. And you don't dispute those 90-day notices were timely? No, we don't. No. They were timely, but not soon enough. Exactly. That's exactly right, and that really does get to the heart of this case, because when I say that this case is about notice and about timing, you know, there's a number of ways that a subcontractor can supply notice to the owner. It can be listed on a Section 5 affidavit. It can be listed on an affidavit supplied by its immediate contractor, which would have been JMC, or it can supply its own 90-day notice or one earlier than that under Section 24. What I think is interesting is that this case in particular really tends to fall, in my opinion, along the lines of the argument that is contained in Justice Cook's specially concurring argument in the case of Contractor's Ready Mix. Because really, if you look at that case, and you look at what Justice Cook said there, is that there are a number of protections built into this statute, which is not a particularly well-drafted statute, but there are a number of defenses put in place for both the owner, the general contractor, and the subs. And there, Justice Cook said, even though there are a number of steps that the owner can take, the owner is not required to avail itself of every protection of the Act. And he goes on to say, and that's true for the subcontractors and suppliers as well, and the way to remedy a situation like this, if you don't want to, as the subcontractor's supplier or sub, if you don't want to rely on the notice that JMC provided or failed to provide, then there's plenty of ways for you to protect yourself. You can send your notice out the day you step on the project. And then from that point forward, the owner has noticed that you're out there, that you're spending money and time on the project, and that you need to be paid. And a failure by the owner to pay or retain money after that kind of notice, yeah, that's a problem. That's not what happened here. Did anybody do that in this case? Any of the other subs? No. Secondary subs? No, none of them. I think as a pragmatic situation, not a lot of them do afford themselves of that protection. You mean in general? In general. In the practice? Yeah, I think that's true. Why wouldn't they, since that seems to be the safest way, based on your argument? I don't know why. I would recommend it, particularly if you're doing business on a project that's large and you're spending lots of money and lots of time on the project. Because what happened here, in this case, since A-Hall and Blager waited until their 90 days was about ready to expire, by the time that notice came in, the only thing left due and owing to JMC was that 5% retainage. Had they sent their notice on the first day, on the 30th day, on the 60th day, might have been more money in the pipeline, but we certainly would have known out there. So what's the purpose of the 90-day provision in Section 24? You're basically saying if they follow the 90-day requirement in Section 24, they're taking a risk. Sure, they are. So what's the purpose of it? Why would the legislature put that in the statute? I think it's an outside deadline so that you can bring some closure to the project. If you had an unlimited amount of time, for example, you would never know when you could pay out or when the liens were ready to come in and be due. I do think that there are a number of protections afforded here, and if you as the subcontractor decide I'm going to rely on the immediate guy ahead of me, that's kind of a business risk, I think, that you assume. I also think that if you want to go the 90-day route, that's also a risk that you assume. I think when we were in front of the trial court, the argument was sort of interesting and maybe a little appealing in the sense that the argument was I am the support supplier and subcontractor out there. I provided materials. I provided labor. I complied with Section 24. So why should I be penalized? And then they went on to argue, and by the way, this statute, the sole purpose of this statute is to protect subs and suppliers. I would argue, and I think the case law supports, that in fact this statute is a balancing among different interests, a balancing of the owner's interests and a balancing of the subs and the supplier's interests. I don't think, and if you look at the cases that have been cited, it's pretty clear that there are plenty of times when the subcontractor or the supplier might comply with Section 24 and then record the lien within that four-month period and yet not get paid anything or get paid some small amount. And so that is the risk that you run if you decide you don't want to record your lien earlier than 90 days. If your clients were to prevail here, what would happen with the secondary subs here in terms of payment? What would be their practical options? Here are the practical options, then. We froze the retainage. At the time that we froze the retainage that was due to JMC, there were three that were still left, Gerdau, A-Hall, and Blager. And if you took the entire amount of money that was due to those three and you figured out what the percentage would be of the total amount that was still left, we figured and calculated that they got 44% of payment, so 44 cents on the dollar, because they're entitled to a pro rata share of whatever is sort of in the pipeline at the time the 90-day notice went out. Now, as a matter of fact, Gerdau took that, and so that is why they are no longer a party to the suit. And what about the other 56 cents on the dollar? Do they have any opportunity to recover that? No, they can go after JMC. That is their remedy. They can pursue them on a contract. Of course, if JMC is playing fast and loose to begin with, it would appear, they're not likely to have a lot left. Well, and that may be true, and we don't know, but there is always a breach of contract available to them on a case like this. So I do think there are some remedies available, and I do think that, you know, the interesting thing is, if you're not being paid for 90 days, one would assume that you might, after the 30th day, wonder where your money is, maybe after the 60th day, where your money is. And, you know, I suppose at first blush, it's easy to say, we feel really bad for you, but on the other hand, you didn't do anything to protect yourself either. And so, really what this case boils down to is, did the owner pay out properly, based on those Section 5 affidavits that they received, and once the 90 day notices came in, what was their obligation? Because the trial court heard argument, and I think bought the argument, that once those 90 day notices went out, not only did you have to freeze what was due and owing to JMC, you couldn't pay anyone else. You were not allowed to pay anyone else, even if they were not part of the problem, and by the way, now owner, you've got to go out and find more money, literally. That was the argument, because under the theory that if you comply with Section 24, you're entitled to recoup your losses 100%. I think if you do... Did the subcontractors know what the Section 5 affidavits that had been submitted to campus showed regarding their interest, if any? I don't know if they did or not. I would doubt it. But wouldn't that make more sense? That way they would know whether they needed to do something to protect their rights. I don't expect you to rewrite the statute. I'd like to rewrite the statute, but there's nothing to say that they can't ask for it. There's nothing to say that they can't... I would assume what should happen is once you're out there and you're supplying money and projects or labor and everything to this bad character, and you're not getting paid, really your remedy is to go back upstream, first to them, because there's no privity between the owner and these people, or even Bruno Russo and these people. So really, you have to force yourself to go back up and find out, well, what's going on here and why am I not getting paid? I think really that's the whole notion behind all of these different defenses that are set forth in the statute. It's truly a balancing. Because when you think about it, and if you look at the case law, what the courts have said is, you know, the owner who's building this multi-million dollar project, they have people swarming all over this place. They have no idea who's out there with the exception of their general contractor and whoever is listed on the Section 5 affidavit, the sworn affidavit. So who should be able to tell the owner, hey, I'm out here and I need to get paid? Well, any sub or supplier. And how do they do that? Send out that notice the first day on the job, or the 10th day on the job, or any day before the 90th day. And I think that is the problem with this particular case. And if you look at this case and the order that was entered, really what the trial court said was, subcontractors are required to comply with Section 24. And they did. And we don't dispute that they did. And so they must be paid 100%. And because you paid others, not involved in this whole mess, then you're unhooked, basically. If you look at the cases that are also cited in here, you know, the one issue is, well, are they entitled to recoup 100%? Or are they entitled to just recoup whatever is due in owing their immediate contractor? And if you think about that, the latter makes more sense. Because otherwise, you could have any bad character out there on a project, not paying people, not doing what they're supposed to do, and yet the good people, the people that are doing what they're supposed to do, if those 90-day notices come in under that, they don't get paid. And really, that is a true holdup. No project would ever get accomplished in a timely manner and without causing overruns to the owner, if that's the argument. So I do think that when you look at this, you know, the order is pretty simple, but it just says these people were last on the job on a certain day, they provided materials and goods and services, they provided their notice, they filed their lien, they didn't get paid. Ergo, they get a lien. And not only do they get a lien, they get a lien for 100%. And the court went on to say, and the equities are with them. I would say the equities are split here. Is the owner not entitled to rely on the Section 5 affidavit, the sworn statement that the general contractor provided? They got a bunch of them. JMC was listed there all the time. Well, I anticipate I'm going to hear in a few minutes that Chicago Title was not the agent of Campus. Yes. What do you have to say about that? Well, first of all, I will say that until I got to the appellate court, I had never heard that argument before. That was never advanced before the trial court, and the trial court never had an opportunity to consider it. Always before the trial court, the issue was, did you get the notice and did you pay out after that? Not, did somebody look at it or did somebody not consider it? I think there is evidence in the record that says that, in fact, Chicago Title is the escrow agent and paid out. It's not like Chicago Title just did this out of the goodness of their heart and the money just kind of magically flowed into their account. The one guy said, the representative for Campus said, when asked, did you consider them to be your agent? The answer was, I hadn't considered it or I didn't consider it. Not, I don't think they're my agent or I don't know what they're doing. In fact, after that question, another question was asked and he said, yeah, I know we had an agreement of some kind. I don't know what it provided for. And further on he says, Chicago Title got the sworn statement. And that's how this all unfolded. And that, too, is a very common occurrence in the construction industry. And, in fact, the statute and case law that has been developed to support it indicates that an owner can pay out or its agent can pay out. The superintendent, I mean, there's any number of ways that payments can be made. So I was rather surprised when I got that argument because I had not heard that before and I wondered then, does that mean that, indeed, they are conceding that we properly paid out and now it is the argument, well, you didn't pay out because you never saw these Section 5 affidavits. Because when you think about it, if you agree that we properly paid out because of the case law contractors, ReadyMix or Brex or those, then what are you left with? The only other thing you can do is attack those Section 5 affidavits. We already know that they've been submitted, so then what do you do? You pull back and you say, well, owner, you must not have seen those and you must not have looked at them. But payments were being made according to those affidavits. I will say I think sometimes it is a question of semantics because when I asked the contractor JMC about a Section 5 affidavit, he had no idea what I was talking about either. It is a term of art. I think a lot of people might refer to it as a sworn statement. And if you look at the owner's representative, he was talking about sworn statements as well. So for those reasons, I do think that the court's grant of the motion for summary judgment should be reversed and either remanded or a judgment for us. Thank you. May it please the Court and the Council. Carl Metz on behalf of A-Hall Contracting. We've agreed to split the time in half between A-Hall and Glegor, so I'll be up for 10 minutes. This case is really not an issue about timing and notices. The Council would like to have the Court frame it. The case is about who complied with the Mechanics' Lien Act. We heard an admission that A-Hall and Glegor complied with the Mechanics' Lien Act. That's not the issue. So they tried to argue that maybe we should have complied sooner or something along those lines. The issue is whether or not campus investors complied with Section 5 of the Mechanics' Lien Act. Clear and simple. Section 5 of the Mechanics' Lien Act provides, that's at 770-ILCS-60-5, it shall be the duty of the owner to require of the contractor before the owner shall pay to the contractor any monies. And the duty is requiring a statement in writing under oath and verified by affidavit that has the names, addresses of all parties furnishing labors, services, materials, fixtures, etc., etc. Also, it has to include the amounts due or to become due. So that's what Section 5 requires. So all along, we have asserted that they have never complied with Section 5 of the Mechanics' Lien Act, they being campus investors, the owner. It's uncontroverted in campus, whether you call it a Section 5 affidavit or whether you call it a sworn statement. Campus investors, 206A represented. So therefore, the deposition testimony is an admission of campus investors, says time and time again, I was never on the circulation list for sworn statements. Never on the circulation list for sworn statements. I only looked at pay applications. I only looked at pay applications. I then considered whether or not they did the work to set forth the pay applications and said, yes, go ahead, Chicago Title Pay. Well, a pay application is not a sworn statement. That's even addressed in the Deerfield case cited in the papers. A pay application is just a certification that the work has been done according to contract specs and that there are due payments set forth and that the previous payments set forth have been received. There's no sworn statement. It's not an affidavit, and it certainly doesn't provide a listing of all parties furnishing labor service material, et cetera, et cetera, with the amounts due or denounced if you come to. So now the issue becomes what they've been calling sworn statements. And Council even admitted they didn't go to the owner. They went to Chicago Title. And I think the bench noted that issue. First of all, I'd submit what they've been calling sworn statements are not sworn statements under the Mechanics Lien Act. The sworn statements, if you look at what she cited to, is all it is is that the following persons have been contracted with by the person submitting the sworn statement. Those are the words. The following persons have been contracted with. It's not a list of all parties furnishing labor services materials, and it's not a list of the amounts due or to become due of all parties. So therefore, even the sworn statements that they say they gave to Chicago Title don't even comply under the Mechanics Lien Act. So we've never conceded or admitted in any way that they've complied with the Mechanics Lien Act, Section 5. Moreover, Chicago Title, there's been no evidence offered to show that Chicago Title took on the owner's duties to comply with Section 5 of the Mechanics Lien Act, none whatsoever. Now, counsel brings up the point that she's surprised that we raised the issue. Well, quite frankly, it was never asserted Chicago Title was their agent until last guessed in the oral argument on summary judgment. So it was never at any point in time asserted that Chicago Title was the one that was revealing sworn statements on behalf of the owners. So it's not Blager or Ahol that's bringing up the last minute. It's Campus Investors' last gasp when they realized that they never looked at a sworn statement or a Section 5 affidavit before they made any payments. Campus Investors, past the 11th hour, realized that they never complied with the act. So as a last-ditch effort, they throw in their oral argument below that, well, Chicago Title reviewed all this stuff. We cite in our materials Chicago Title or Title Company cases wherein the agency is defined specifically by what the written agreement is. They didn't provide any information. In fact, she alluded to the testimony of Campus Investors and said, I didn't consider them as my agent. What relationship did they have if it wasn't one of agency? Well, they were, in essence, acting as a payout clearinghouse. And what they were doing, and you can get in the testimony of the Campus Investors representative, they would get documentation. They would then wait to hear from the bank, which is RBS, that was part of the materials. The bank would give their okay, and then they'd wait to hear from Campus Investors and say, ask Campus Investors, is it okay for us to pay out this money? And so they would act as a clearinghouse. And ultimately, I suppose it's not a record that they were going to provide, ultimately they provide a title indemnity when the lien's debt. Certainly that's not on behalf as an agent for Campus Investors. It's providing protection for the lender at that point in time. So, again, there's no evidence to support any type of, I think they asked for their papers, an inference that Chicago Title was doing something on their behalf to comply with the Mechanics Lien Act. It's just not there. It's just not in the record. And quite frankly, if it was there, we'd have seen it. They'd have been waiving it, and they'd have been telling us about it. So what that brings us to, their failure to follow Section 5 of the Mechanics Lien Act does not avail them any defense under the Mechanics Lien Act. The Mechanics Lien Act is a balancing of everybody's rights. And if the owner follows and does what it's supposed to do under the Mechanics Lien Act, then it can assert certain defenses, one of which I pay properly under the method provided in the Mechanics Lien Act, therefore I do not have to pay twice. But there's many cases that come down that says when the owner does not comply with Section 5, it doesn't matter, the owner pays twice. In the Seminole case a couple of years ago, it was a Weathertight case. The Weathertight case is where the owner actually looks at Section 5 affidavits. The owner pays the general contractor. The general contractor's bank then sweeps the money out in bank accounts. So the general contractor doesn't have the ability, though the general contractor intended to, doesn't have the ability to pay general contractor's subs. And in a Weathertight case, a Supreme Court case, the court said, Owner, you've got to pay twice. You've got to pay again because you did not make sure that the subs got paid. So the owner had to reach into their pocket and pay twice. So when we talk about equities, it's well settled. If the owner doesn't comply with the Act, and in this case, the owner did less than the owner in St. Francis, University of St. Francis in the Weathertight case. The owner did a lot less than that owner. So I would submit it's not about notice. It's not about timing. It's about whether or not the owner complied with Section 5 of the Mechanics-Lena Act. I would also, I'm not sure I've got time to talk about, one of the arguments they raised in their brief, though she didn't raise it in her oral argument, is somehow the settlement that they reached with Jacobs, Meyer, Malden the week before trial undercuts us and we get nothing because we have to share a pro-rata share of nothing. I think Section 27 of the Mechanics-Lena Act clearly addresses that on all fours. Once our liens are broken, once they know about it, they can't circumvent us and settle with somebody else and say, hey, I took care of your lien. You've got to go to somebody else. And by the way, I didn't give them any money. And they cite Premier Electric for the purpose, for the proposition to support their argument. Premier Electric, if you read it, the contractor, the subcontractor in that case, did not follow the Mechanics-Lena Act as the property owner, so they didn't have Mechanics-Lena rights as the property owner. They only had lien on funds that came to the general contractor. So therefore, they were only entitled to share with the general contractor as it got to the case. In this case, they've been admitted many times. We did what we were supposed to do. We properly liened the property. Therefore, under Section 27, they cannot settle off from under us. If you were to accept their argument, it would just create a path for everybody to circumvent subcontractors, material suppliers, everybody down the line who properly perfected liens, because then they could just go to somebody above them, settle off with them for pennies on a dollar and walk away. Would it serve a good purpose, given the nature of the industry, for the subs to file sooner? I mean, as soon as they begin work. It would seem to me like if I had something being built at my house, and I saw that the contractor was calling somebody else in to do the garage, who the hell is that guy and how much do I owe him? If I may answer the question, a couple of things. With respect to homes, we'll go to commercial property. We're talking about just the practicalities, the nature of the business. Everybody screams up and down the chain when somebody serves something. It's a whole relationship thing, up and down the thing. It's like you don't trust me. You file it and you don't trust me. I'm going to get you paid. I've always gotten you paid. Why are you doing this? You've got the owner concerned. They're freezing money now. All of a sudden, I can't get anybody paid. Everybody gets upset. It's turmoil. It's sort of a relationship balancing. The rules are the rules. There's no question. We complied with the rules. It should come down to whether or not we should have complied earlier. It's also true that doing it this way, at least in this circumstance, means somebody is going to get the shaft. Under the current facts, yes. Under the current facts, somebody gets the shaft. But what I would submit to you is had the owner complied from day one and had they required the whole chain to comply from day one, we'd have been paid. But had the owner required, under Section 5, a list of all parties that are working on their project and the amounts due and the amounts come due, we'd have showed up on a list. Owner A would have gotten one, would have looked at it, we'd have showed up on a list, and we'd have gotten paid and we wouldn't be here. Thank you for your time. Thank you. Thank you. May it please the Court, Counsel. My name is Mark Palmer. I'm an attorney for Blager Concrete Company. In this case, we are exactly in the same position as A-Haul. Everything, luckily, at the trial court level, was stipulated to as far as our liens, whether they were timely, both the 24 section notice and the lien itself under Section 7. Again, and not to reiterate in full Mr. Metz's arguments, but I wanted to turn the attention first towards our counterclaim at this point, and that is addressed in Section 17 of the New Counseling Act, which has several facets to it, one being a statutory requirement to the Court to impose the interest, which was done at the trial court level. But our denial of our attorney's fees request is what's at issue in our counterclaim. And looking to the words of Section 17B, that lays it out in detail saying, it must be without just cause or right that the owner failed to pay a lien. And the statute goes on in Section D to expressly define their meaning of without just cause or right, which is very similar to what we find in Machu Picchu 137. So it's a very similar standard we propose, and case law has said that that is an objective standard. So it's not what necessarily the defendants believed was their failure to pay, but what was objectively, was there actually a warrant of well-established reason at law, or in their case some argument to be made. Applying our summary judgment arguments that were successful at the trial court level, we argued that there was not a defensible argument made, and that does turn in a circular argument again back to the Section 5 affidavits, which we don't believe were valid. Let me point out as well, that our point here is kind of an idea of, if not here, when? If this is a built-in section of the McHanus-Lean Act to allow judicial discretion to award attorney's fees, here we are, Ahall Blager, doing everything we could possibly do besides filing from day one the 24 notice, which Mr. Metz makes the argument, and I support that position, that we had no reason to think anything was wrong from the beginning. It was not until the end of the project that we were suspecting that we were not getting our final payments. But did campus have any reason to think anything was wrong? I cannot answer that question. They were submitting payment orders, but their involvement on-site, on-project, I do not know the answer to that. But once we did not receive final payments, of course, we complied as stipulated to within the 90-day requirement, and filed that timely and appropriately, and gave the notices. And that kind of turns to the Weathertide case, which says, once the sub has made that Section 24 notice connection linked with the sub, the chain is now destroyed. Now there is a relationship between you, owner, and that sub, and you need to talk to that owner and find out what they are due. This down-the-chain payment is now destroyed and not at issue anymore. And I think Weathertide makes a good point of that, and so does Crawford Supply Company case out of the First District of 2009 also, which follows the Weathertide case, gives a lengthy discussion of Weathertide, and does so in a very good way. And there is a distinct but important distinction there, where the loser in Weathertide, the university, argued that owner may rely on general contractor's sworn statement, and then pay as a general contractor. The Supreme Court said, no, that is not right. The general contractor receives that notice, and then has a duty to retain money to pay the subs, just like I explained a second ago, that new link is now created. So they have a duty to respond to that, and now that the subs, Ahol and Blager, have complied with 24 to notify them of the money's due, that's all that is now at issue. That full amount is due. So turning back to the overall theme of the McCancelling Act of itself, it's a procedure that's set forth in both protecting the lien, and duties imposed on the owner, and I completely agree with counsel. It is meant to be a balancing, equitable statute. Of course, the main word in that statute is lien. It's a Mechanics of Lien Act, because the owner is the money holder. The money bags, and of course the improvements of the property,  Now whatever is built there and constructed, that's where the money and value comes. And once those have been strictly followed, emphasis on strictly, as Blager and Ahol did, now it becomes a remedial statute. And when it becomes a remedial statute, it is now to be interpreted with liberal construction, so that justice may be done, and terms of equity are followed. And that's even expressly stated in the last section, 39, of the Act itself. And that's what I wanted to leave you with today, with that interpretation of liberal construction and equitable principles, should be the gravamon of expanding on, did the owner strictly follow Section 5? If you have any further questions for myself or Mr. Metz, I'm happy to take them. No questions. Thank you, Your Honor. May it please the Court and Counsel, in terms of the attorney's fee provision, that is within the discretion of the trial court. The trial court did exercise its discretion to deny those. I don't think this particular case rises to the level of what one would look at under Rule 137. Obviously there are lots of arguments to be made here, and they're not specious, or made maliciously, or without basis in fact. So just because the court did not accept the argument, doesn't mean that we get sucked with the attorney's fees as well. I think that if the court looks at the sworn statements that were submitted by Browne Russo to Chicago Title, at the very top there is that sworn affidavit language. Those are to be found at C1180-C1181 and C1933-1934. As an example. And I would also say that this case can absolutely be distinguished from Weathertight. Weathertight was a case where the general contractor provided the Section 5 affidavit to the owner, who happened to be a university, and they listed the wronged party, the subcontractor. And instead of either holding out money for the wronged party, the subcontractor, or getting a lien waiver, or writing a two-party check, or anything like that, what they did was they just paid all of the money over to the general contractor on the assumption that they would in turn pay their subcontractor. And of course then it went into the bank account, and the bank exercises set off, and there's no money for the subcontractor. Very, very different case from what we have here. Because the minute we got the notice, we froze what was left. And do it owing to JMC. What do you think Mr. Metz means when he says that you didn't comply with the Act? Well, you know, I think that's an interesting question. I don't know, because I would say that we have complied with the Act. I would say by submitting the Section 5, the sworn statements, that I've referred to in the record, to Chicago Title for payment. It's pretty clear that from the owner's representative that he said, yeah, we were getting the pay requests and there's talk going back and forth, but the sworn statements went to Chicago Title. So there are Section 5 affidavits in the record that were submitted by the general contractor. So these are effectively a payout memo that says sworn affidavit at the top, and it's signed. Is that the right? It's actually more than that. Okay. At the top it says, I, John Russo, the Executive Vice President of Braun Russo, do solemnly swear and depose on my oath that the following persons have supplied labor and materials to this project, and they are, have been paid, and are about to become due in owing the following sums that are listed out next to their names. Which is all true. Yeah, right. And it's a Section 5 affidavit. I mean, but I'm understanding Mr. Metz is supposed to say that there are other people, too, who haven't yet been paid, or we're not paying them yet, or there's some reason for it, or you need to know. Yeah. I think, here's what I think he's arguing. I may be wrong, but I'll take a stab at this. You know, the general contractor would only list all the people that he has subcontracted or has gotten materials supplied by him, because that's who he's in privity of contract with, and that's who he knows is out there. I think what I hear being argued now is that it's the duty of the general to find out who are all the people that these subs are employing or getting money from or supplies or whatever. I don't think that's at all a duty under the statute. Well, what does that word duty mean in the statutory language that Mr. Metz recited? Well, if you look at the statute, which is... That's always dangerous, but we should do it. Particularly this statute, because it's a hard statute to follow. And you can see that... Witness your presence here. Yeah, exactly. Exactly. You know, if you look at Section 5 of the statute, it basically says, it shall be the duty of the contractor to give the owner and the duty of the owner to require, before the owner or his agent can pay out, basically a statement in writing under oath or verified by affidavit of the names and addresses of all parties furnishing labor services, etc. I don't think, and nowhere have I seen anything that says it's the duty of the general contractor to go beyond... To go behind that. Yeah, exactly. Because think about it this way. Think how many laborers are out there. Do you have to then impose a duty on the general contractor to go to every sub or supplier and say, give me the names of everybody who's worked with you on this project? If you went to Lowe's and bought a box of nails, I need to know that too. I mean, you can think, what would the Section 5 affidavits look like? I mean, they'd be books and books and books. That's not what this statute requires. So for all of those reasons, I do believe that the trial court, I do think he was right on the issue of attorney's fees, incorrect on everything else. I would ask that it be reversed. Thank you. Thank you, counsel. We'll take this matter under advisement.